

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| ALLIANT CREDIT UNION, | ) | |
| | ) | No. 10 C 0737 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Honorable Charles R. Norgle |
| | ) | |
| CUMIS INSURANCE SOCIETY, INC, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

CHARLES R. NORGLE, District Judge:

Plaintiff Alliant Credit Union ("Alliant"), has filed suit alleging breach of contract by Defendant CUMIS Insurance Society, Inc. ("CUMIS"), based on CUMIS's decision not to defend Alliant or reimburse Alliant's costs in underlying litigation. Before the Court is CUMIS's Motion For Summary Judgement and Alliant's Cross-Motion For Partial Summary Judgment, brought pursuant to Federal Rule of Civil Procedure 56. For the following reasons, each motion is granted in part and denied in part.

### I. BACKGROUND[1]

#### A. Facts

Alliant is a credit union chartered in Illinois. CUMIS is an Iowa corporation which, among other things, sells insurance products to credit unions. Alliant bought three insurance products from CUMIS effective July 27, 2008, to July 27, 2009, and then renewed one more year. The policies

---

[1]The Court takes the facts from the parties' Local Rule 56.1 statements and accompanying briefs and exhibits. Disputed facts are noted in the text.

were: a Credit Union Bond Policy ("Bond"); a Directors, Volunteers and Employees Policy with an Entity Endorsement ("DVE"); and a Supplemental Entity Litigation Policy ("SEL"). Alliant kept current on its premiums. Five months after the policies took effect, Alliant was sued by a California limited partnership, 625 3rd Street Associates, LP ("625 3rd Street"), in California state court. Alliant removed to the Northern District of California. The case then settled. CUMIS did not defend Alliant and refuses to reimburse Alliant for the costs of litigation and settlement. CUMIS maintains that under the circumstances the policies do not provide coverage. Alliant disagrees.

The underlying litigation stemmed from a 2007 transaction between 625 3rd Street and another non-party, Kaiperm Federal Credit Union ("Kaiperm"), a federally chartered credit union. Kaiperm sold 625 3rd Street a piece of property with a deal to lease it back for fifteen years. Kaiperm got into financial trouble, and Alliant moved in for a merger. To deal with the lease, Alliant turned to the National Credit Union Administration ("NCUA"), which, using its federal supervisory powers, placed Kaiperm into liquidation and transferred Kaiperm's assets, with the exception of the lease, to Alliant.

625 3rd Street filed a ten-count complaint Dec. 30, 2008, against Alliant in Califonia Superior Court of Alameda County for: (1) interference with contractual relations; (2) inducement to breach contract; (3) interference with prospective economic advantage; (4) intentional misrepresentation; (5) fraudulent concealment; (6) rescission; (7) breach of lease; (8) breach of contractual warranties; (9) breach of the covenant of good faith and fair dealing; and (10) bad faith denial of existence of contract. In effect, the underlying litigation claims that Kaiperm spent months defrauding 625 3rd Street, only for Alliant to pick up where Kaiperm left off. Alliant, the theory

goes, is liable not only for Kaiperm's fraud as Kaiperm's legal successor but also as a perpetrator of its own fraudulent scheme against 625 3rd Street.

Alliant contends it timely tendered its defense Jan. 21, 2008, to CUMIS in accord with the policy terms. CUMIS denied coverage in a Feb. 5, 2009 letter. Alliant seeks reimbursement from CUMIS of more than $1 million in defense and settlement costs as well as other relief arising from an alleged breach of a duty to defend and indemnify Alliant in the underlying litigation. Both parties have moved for summary judgment on the issues of whether CUMIS owed or owes Alliant duties to defend, indemnify, or both. The relevant facts are undisputed, consisting primarily of the terms of the relevant insurance policies and the contents of the pleadings in the underlying lawsuit between Alliant and 625 3rd Street. This case is brought in diversity, and the parties agree Illinois law governs.

## II. DISCUSSION

### A. Legal Standards

#### 1. Summary Judgment

"The construction of an insurance policy and a determination of the rights and obligations thereunder are questions of law for the court." Am. Econ. Ins. Co. v. DePaul Univ., 890 N.E.2d 582, 587 (Ill. App. Ct. 2008) (internal citation omitted). Cases involving contract interpretation are "particularly suited to disposition by summary judgment." United States v. 4500 Audek Model No. 5601 AM/FM Clock Radios, 220 F.3d 539, 543 (7th Cir. 2000). Summary judgment is appropriate when the record shows "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (c). In deciding whether genuine issues of material fact exist, the reviewing court construes all facts and draws all reasonable inferences in

3

favor of the non-moving party. See Fed. R. Civ. P. 56 (c); see also Koszola v. Bd. of Educ. of City of Chi., 385 F.3d 1104, 1108 (7th Cir. 2004). Here the parties agree no material facts are at issue.

## 2. Duty to Defend

To determine whether an insurer has a duty to defend its insured in Illinois, the Court must "compare the factual allegations of the underlying complaint . . . to the language of the insurance policy." Amerisure Mut. Ins. Co. v. Microplastics, Inc., 622 F.3d 806, 810 (7th Cir. 2010). "If the facts alleged in the underlying complaint fall within, or potentially within, the policy's coverage, the insurer's duty to defend arises." Id. (internal citation omitted); Crum & Forster Managers Corp. v. Resolution Trust Corp., 620 N.E.2d 1073, 1079 (Ill. 1993). The "burden of proving that a claim falls within an exclusion" to an insurance policy falls on the insurer. Hurst-Rosche Eng'rs, Inc. v. Commercial Union Ins. Co., 51 F.3d 1336, 1342 (7th Cir. 1995). An insurer can decline to defend its insured only if, "from the face of the complaint, the allegations are clearly outside the bounds of the policy coverage." Nat'l Case Co. v. McFatridge, 604 F.3d 335, 338 (7th Cir. 2010). The Court construes the complaint's allegations liberally in favor of the insured. Gen. Agents Ins. Co. of Am. v. Midwest Sporting Goods Co., 828 N.E.2d 1092, 1098 (Ill. 2005). However, "an insurer has no duty to defend unless the underlying claim contains *explicit* factual allegations that potentially fall within policy coverage." Amerisure Mut. Ins. Co., 622 F.3d at 810 (emphasis added). A court "is not permitted simply to speculate about possible factual allegations that are absent from the claim itself." Id. at 814.

According to the Illinois Supreme Court, a court's chief aim in constructing an insurance policy is giving effect to parties' intent as expressed in the policy terms. Valley Forge Ins. Co. v. Swiderski Elecs., Inc., 860 N.E.2d 307, 314 (Ill. 2006). The policy should be construed as a whole

4

such that every provision serves a purpose. Id. Unambiguous policy language must be applied as written, using words' plain, ordinary meanings. Id. Ambiguous language is that susceptible to multiple interpretations, and ambiguities are strictly construed against the drafter. Id. Ambiguity does not, however, arise merely because parties suggest creative interpretive possibilities. Id.

### 3. Duty to Indemnify

Once the insured has accrued liability in the underlying lawsuit, the duty to indemnify is implicated. Certain Underwriters at Lloyd's, London v. Boeing Co., 895 N.E.2d 940, 956 (Ill. App. Ct. 2008) (citing Outboard Marine Corp. v. Liberty Mut. Ins. Co., 607 N.E.2d 1204, 1221 (Ill. 1992)). To trigger coverage of a settlement without a verdict, the insured must have settled "an otherwise covered loss in reasonable anticipation of personal liability " to recover the settlement. Fed. Ins. Co. v. Binney & Smith, Inc., 913 N.E.2d 43, 48 (Ill. App. Ct. 2009) (internal quotation marks omitted). That is, an insured is only entitled to indemnity for losses that actually fall within the terms of the insurance policy. Binney & Smith, 913 N.E.2d at 54. To determine whether the claimed loss was actually covered by the indemnity policy, a court must compare the allegations in the underlying lawsuit to policy language. Id.; see also Santa's Best Craft, LLC v. Zurich Am. Ins. Co., No. 1-09-1634, 2010 WL 5293369, at *7-8 (Ill. App. Ct. Dec. 21, 2010).

### B. Factual Allegations in the Underlying Complaint[2]

The complaint in the underlying litigation makes the following allegations.

In May 2007 Kaiperm approached 625 3rd Street offering to sell a piece of property with the pledge to lease it back. Kaiperm assured 625 3rd Street orally and in writing that Kaiperm was

---

[2] Compl. Ex. A, at 3 & *passim* (625 3rd Street's Complaint for Damages and Equitable Relief). The actual truth of the allegations is not at issue. The Court is deciding whether, as a matter of law, the allegations in the original complaint in California state court bring the case within any of the coverage provisions.

5

financially sound. Kaiperm directed 625 3rd Street to its published financial statements, which reflected an "adequately capitalized and financially stable" operation. Kaiperm promised to keep both the purchase money and the return realized by the fifteen-year lease liquid. On May 15, 2007, 625 3rd Street signed a letter of intent to pay Kaiperm a purchase price of $8 million. As conditions precedent, NCUA would have to approve the deal and Kaiperm would have to execute a fifteen-year lease. On August 21, 2007, Kaiperm informed 625 3rd Street that NCUA approved the deal. Kaiperm was responsible for furnishing this information under the Purchase and Sale Agreement ("PSA") with 625 3rd Street. Absent NCUA's approval Kaiperm lacked authority to enter the PSA. Kaiperm executed a fifteen-year lease and the deal closed Aug. 31, 2007. For the next eight months, Kaiperm complied with the lease terms and told 625 3rd Street it was financially healthy through communications between Stan Abrams ("Abrams"), Kaiperm's CEO, and 625 3rd Street's representative, Ron Kaufman.

On May 15, 2008, Kaiperm's attorney, Sheldon Greene ("Greene"), called Brian Perlman ("Perlman"), 625 3rd Street's representative, with the news that Kaiperm was in financial trouble and Alliant soon would merge with it. Greene told Perlman that Alliant wanted to "cut a deal" on the lease. Around June 6, 2008, Alliant representatives told 625 3rd Street that any dealings with Kaiperm would now be with Alliant. Beginning in May or June 2008, Alliant became the exclusive managing agent of Kaiperm and held itself out as such. Alliant abandoned the Kaiperm business plan 625 3rd Street was counting on for long-term liquidity, instead creating a blueprint for Kaiperm's eventual insolvency–an event that would financially benefit Alliant.

Beginning in June or July of 2008, Alliant succeeded to Kaiperm's liabilities when Alliant effected a de facto merger by: transferring Kaiperm's accounts to its own; publicly announcing and

6

advertising it had merged with Kaiperm; controlling Kaiperm's operations and investments; obtaining majority voting control of Kaiperm's board of directors; controlling the lease property; acquiring Kaiperm's assets; servicing Kaiperm's customers as its own; holding itself out as Kaiperm's merger partner, successor, or both; occupying the lease property for its own benefit; and reducing Kaiperm's net worth by a more than twenty-five percent. Alliant made Kaiperm's rent payments on the lease in June, July, and August 2008.

During this time Alliant negotiated unsuccessfully with 625 3rd Street to buy out the lease. Alliant "openly" threatened 625 3rd Street with Kaiperm's liquidation and repudiation of the lease by NCUA unless 625 3rd Street agreed to Alliant's buyout offer. 625 3rd Street refused. Alliant turned to NCUA and informed the federal supervisory agency that Alliant was not Kaiperm's merger partner and would abandon any such role with Kaiperm unless NCUA placed Kaiperm in liquidation and transferred all Kaiperm's assets and liabilities–except the lease–to Alliant. Alliant and NCUA drafted a plan to place all of Kaiperm's assets and liabilities with Alliant. Subsequently, Alliant ran Kaiperm into the ground, prompting the apparent need for NCUA's intervention and execution of the plan NCUA hatched with Alliant. On Sept. 26, 2008, NCUA placed Kaiperm in involuntary liquidation and transferred all Kaiperm's assets and liabilities to Alliant. NCUA did so even though Alliant offered no consideration; the sole purpose was to protect Alliant from Kaiperm's liabilities to 625 3rd Street's detriment; the lease was not a Kaiperm asset NCUA had the power to liquidate since Alliant had already assumed it months earlier; and Kaiperm's placement in involuntary liquidation was inappropriate under NCUA's own rules.

On Oct. 23, 2008, NCUA told 625 3rd Street it had repudiated the lease pursuant to its statutory powers. By this time, Alliant had moved its operations from the lease property to another

location. NCUA was aware of Alliant's planned October move when it placed Kaiperm into involuntary liquidation in September. (After serving a notice of abandonment, 625 3rd Street terminated the lease Dec. 13, 2008.) 625 3rd Street learned only later that Kaiperm suffered from severe mismanagement even before Kaiperm approached 625 3rd Street about the sale lease-back in May 2007. Kaiperm's financial condition was in "crisis" all along, which Kaiperm's financial statements concealed and which Kaiperm's officers knew and likewise concealed at the time of the sale lease-back negotiations. Kaiperm never actually obtained NCUA's approval for the deal. Nor after the deal closed did Kaiperm keep the purchase money or the returns liquid, instead using them for risky investments. Moreover, Kaiperm had reported its impaired condition to NCUA, which was investigating Kaiperm prior to May 2007.

## C. The Policies

What the parties agree are relevant policy provisions are set forth below.

### 1. Directors, Volunteers, and Employees Policy ("DVE")

The DVE policy states:

CUMIS will pay any "loss" that the "insureds" become legally obligated to pay as a result of any "claim" against the "insureds" that is first made during an Annual Policy Period. . . . CUMIS will pay to the "credit union" any "loss":
> a. For which coverage would be provided to the "insureds" under the Directors, Volunteers Or Employees Coverage of this Policy; and
> b. For which the "credit union" has indemnified the "insureds" as permitted by law; and
> c. For which CUMIS has not previously made payment on behalf of the "insureds" under this Policy.

"Loss" as defined in the Illinois endorsement in the DVE means the following amounts that the "insureds" may become legally obligated to pay as the result of a "claim":
> a. "Defense costs"; or
> b. Compensatory damages awarded in judgments; or

8

c. Non-compensatory damages, multiplied or enhanced compensatory damages, or multiplied or enhanced attorneys' fees awarded in judgments, unless uninsurable under applicable law; or

d. Amounts paid in settlements entered into with the consent of CUMIS

"Insured" as defined in the DVE policy means any of the:

a. "Directors"; or

b "Volunteers"; or

c. "Employees"

However, "emoployees" are not an "insured" when when NO COVERAGE is shown on the Declarations as the Annual Aggregate Limit for "employees."

"Claims" are defined in the DVE in relevant part as:

a. A civil action or proceeding, or an arbitration or other alternative dispute resolution proceeding, for a "wrongful act" which could result in a binding adjudication of liability for damages or other civil relief . . . .

"Employees" are defined in the DVE as:

[P]ersons who were, are, or may be in the future:

a. Acting

1) While under the immediate direction and control of the "credit union" in the conduct of its business; and

2) In the course or scope of performance of their assigned duties; and

b. Paid a regular wage or salary by the "credit union" or by an employment service or sponsor who provides such persons to the "credit union."

"Wrongful act" is defined in the DVE in pertinent part as:

1. [A]ny actual or alleged act, error, omission, neglect, breach of duty, misstatement or misleading statement attempted or committed by the "insureds" in the discharge of their respective duties as "directors," "volunteers" or "employees" of the "credit union," or any matter claimed against them:

a. Solely by reason of their status as such "directors," "volunteers" or "employees"

Regarding any duty to defend, the DVE provides:

CUMIS has no duty to defend any "claim" against the "insureds," or to pay any "defense costs" prior to the final adjudication or disposition of any "claim."

However, if it is reasonably likely that coverage will be afforded under this Policy for any "claim," then subject to any applicable deductible, CUMIS will either

> a. Conduct the investigation, defense and settlement of the "claim," in which event CUMIS will choose attorneys to investigate and defend the "claim" and will pay "defense costs" as incurred; or
> b. Advance "defense costs" as they are incurred by the "insureds," and prior to the final adjudication or disposition of the "claim" . . . .

"Defense costs" as defined in the DVE's Illinois endorsement are "reasonable attorneys' fees, disbursements, expenses and court costs incurred in the investigation and defense of a "claim" against the "insureds," including any appeals and the premium for any attachment, appeal or other similar bonds."

The DVE excludes from coverage as follows:

CUMIS will not be liable to make any payment for "loss" in connection with or arising out of any "claim" . . . [b]ased upon or resulting directly or indirectly from any act, error, omission, neglect or breach of duty by the "insureds" while serving as an employee, director or volunteer of, or in any other capacity for, an entity other than the "credit union," regardless of whether such service was undertaken, or such act, error, omission, neglect or breach of duty was committed, at the request or direction of the "credit union" or anyone else.

As to a merger, the DVE provides:

2. [I]f the "credit union" consolidates or merges with another institution during the current Annual Policy Period, this Policy will automatically provide coverage . . . provided that the assets of the entity merging with the "credit union" or consolidated with the "credit union" as a result of such consolidation or merger are less than 50% of the "credit union's" assets at the time of consolidation or merger.

Coverage provided under the Entity Endorsement of the DVE policy is subject to

provisions of the basic DVE coverage except where altered by additional definitions,

exclusions, and conditions contained in the Entity Endorsement.

"Insureds" are defined in the Entity Endorsement as any of the following:

1. "Directors"; or
2. "Volunteers"; or
3. "Employees"; or
4. "Credit Union."

"Wrongful act" is defined in the Entity Endorsement in pertinent part as:

1. [A]ny actual or alleged act, error, omission, neglect, breach of duty, misstatement or misleading statement committed or attempted by the "credit union"
2. "Wrongful act" also means any actual or alleged act, error, omission, neglect, breach of duty, misstatement or misleading statement committed or attempted by an "insured" other than the "credit union" in the discharge of their respective duties as "directors," "volunteers" or "employees" of the "credit union," or any matter claimed against them solely by reason of their status as such "directors," "volunteers" or "employees."

The Entity Endorsement excludes from coverage as follows:

CUMIS will not be liable for "loss" in connection with or arising out of any "claim" against the "credit union":
**Breach of Contract**
Based upon or Resulting directly or indirectly from any breach of contract
**Conflict of Interest or Bad Faith**
Based upon or resulting directly or indirectly from conflicts of interest or acting in bad faith on the part of any "insured" or any person for whose actions an "insured" is legally responsible.
**Insolvency of Financial Institution**
Based upon or resulting directly or indirectly from the insolvency, conservatorship, receivership, bankruptcy or liquidation of any bank or banking organization, insurance company, investment company, investment banker or any broker or dealer in securities or commodities, or other such organizations of a similar nature, or the failure to pay or suspension of payment of such organizations.


## 2. Special Entity Liability Policy ("SEL")

The SEP provides coverage as follows:

CUMIS will pay on behalf of the "credit union," "loss" the "credit union" is legally obligated to pay as a result of any "claim that is first made against the "credit union":
**Unfair or Deceptive Trade Practices**
For unintentional violations of any unfair or deceptive trade practices act, statute, regulation, or other law.

"Credit union" is defined in the SEL as "the entity shown on the Declarations."

"Claim" is defined in the SEL in relevant part as:

a. A civil action or proceeding, or arbitration or other alternative dispute resolution proceeding, which could result in a binding arbitration of liability for damages or other civil relief.

Applicable to the Illinois endorsement, the SEL defines "loss" in pertinent part as:

> 1. "Loss" means the following amounts that the "credit union" may become legally obligated to pay as the result of a "claim" for:
>> a. "Defense costs"; or
>> b. Damages awarded in judgments; or
>> c. Amounts paid in settlements entered into with the consent of CUMIS

The SEL defines "employee" in relevant part as:

> 1. "Employee" means any of the following persons when performing work for the "credit union" under the "credit union's" immediate direction and control:
>> a. Persons to whom the "credit union" pays a wage or salary; or
>> b. Persons provided by an employment service; or
>> c. Persons serving on the "credit union's" committee appointed or elected by the "credit union's" Board of Directors or by the "credit union's" membership in accordance with the "credit union's" bylaws or by written resolution of the "credit union's" Board of Directors; or
>> d. Your "credit union" "volunteers," except for "directors" acting as "directors"; or
>> e. Persons who are directors but are acting in the capacity of an "employee," as defined here.
> 2. "Employee" also means:
>> a. Employees of a credit union consolidated or merged with you prior to the effective date of this Policy.

Regarding a duty to defend, the SEL policy provides:

> 1. CUMIS has no duty to defend any "claim" against the "credit union," or to pay any "defense costs" prior to the final adjudication or disposition of any "claim." However, if it is reasonably likely that coverage will be afforded under this Policy for any "claim," then subject to any applicable deduction, CUMIS will either:
>> a. Conduct the investigation, defense and settlement of the claim," in which even CUMIS will choose attorneys to investigate and defend the "claim" and will pay "defense costs" as incurred; or
>> b. Advance "defense costs" as they are incurred by the "credit union," and prior to the final adjudication or disposition of the claim" . . . .

As defined in the SEL, "defense costs" in relevant part are "reasonable attorneys' fees, disbursements, expenses, arbitrator's or mediator's fees and court costs incurred in the investigation and defense of a 'claim' against the 'credit union,' including any appeals and the fees for any attachment, appeal or similar bonds."

The SEL's exclusions are as follows:

CUMIS will not be liable to make any payment for "loss" in connection with or arising out of any "claim":
**Employee or Director Dishonesty**
Resulting directly or indirectly from dishonest acts committed by an "employee" or "director," acting alone or in collusion with others.
**Insolvency**
Based upon or resulting directly or indirectly from any alleged or actual financial failure, financial inability to pay or insolvency of:
      1. The "credit union"; or
      2. A business entity in which the "credit union" has an ownership interest.

### 3. The Bond Policy

The Bond provides coverage in pertinent part as follows:

We will pay for your loss resulting directly from dishonest acts committed by an "employee" or "director," acting alone or in collusion with others.
Such dishonest acts must be committed by the "employee" or "director" with the intent to:
      a. Cause you to sustain such loss; or
      b. Obtain an improper benefit for the "employee," "director," or for any other person or entity.

The Bond defines "employees" in relevant part as:

[P]ersons who were, are, or may be in the future, acting under your immediate direction and control in the conduct of your business and while in the course or scope of performance of their assigned duties; and
      a. Paid a regular wage or salary by you or by an employment service who provides such persons to you.
2. "Employee" also means:
      b. Employees of an institution merged with you prior to the effective date of this Bond.

The Bond provides in pertinent part:

We will pay for:
1. "Defense costs" incurred on your behalf by us if we elect to defend; or
2. Reasonable "defense costs" paid by you if we elect not to defend
any "lawsuit" brought by you to enforce your liability or alleged liability for any loss, claim or damage which, if established against you, would constitute a valid and collectible loss under this Bond in excess of the applicable deductible . . . .

The Bond defines "defense costs" in relevant part as "reasonable attorneys' fees, disbursements, expenses and court costs incurred in the investigation and defense of a 'lawsuit,' including any appeals and the premium for any attachment, appeal or other similar bonds."

The Bond excludes from coverage:

Any direct or consequential loss, including, but not limited to:
    a. Loss of use of property; or
    b. Diminution of value of property; or
    c. Earnings or interest not realized by you, whether past, present or future, earned or unearned.
However, compensatory damages sought against you for prejudgment interest, attorneys' fees or loss of use of property will not be excluded from any applicable coverage by reason of this exclusion.

## D. Coverage Under the Policies

### 1. The Bond

CUMIS argues it had no duty to conduct the defense of the lawsuit on Alliant's behalf because the policy terms reserve CUMIS's right to decide whether to conduct a defense or to simply reimburse Alliant later. "Unambiguous policy language must be applied as written." Valley Forge Ins. Co., 860 N.E.2d at 314. The simple and unqualified Bond language, "we will pay . . . if we elect to defend," clearly reserves the option of defending the suit to CUMIS's discretion. The Court constructs the Bond to give effect to the parties' intent as expressed in the policy's terms. See id. Alliant knew that even if a claim against it triggered coverage Alliant may nevertheless have to front

14

litigation costs and await reimbursement. CUMIS by the terms of the policy therefore had no duty to defend. Nor is CUMIS estopped from arguing policy defenses. Cf. Eclipse Manuf. Co. v. U.S. Compliance Co., 886 N.E.2d 349, 356-57 (Ill. App. Ct. 2007).

The only issue with respect to Bond coverage is indemnity. Narrower than a duty to defend, the duty to indemnify arises once the insured accrues liability for a loss arising out of a covered claim. Binney & Smith, 913 N.E.2d at 54. The Court must decide whether underlying allegations resulting in a loss to Alliant fall "actually within" the terms of coverage. Id. The Court compares the allegations in 625 3rd Street's underlying complaint with the Bond terms.

As an initial matter, the parties make much of whether the Bond is a "fidelity bond," which ordinarily indemnifies "an employer or business for loss due to embezzlement, larceny, or gross negligence by an employee or other person holding a position of trust." Black's Law Dictionary (9th ed.). This definition implicates the Bond's "dishonest acts" provision. According to the Illinois Supreme Court, a court should take note of the "nature of the policy at issue and risks undertaken," which may help to indicate the breadth of intended coverage. Outboard Marine Corp., 607 N.E.2d at 1215 (inferring from a policy's "comprehensive general liability" label that parties contracted for "a wide scope of risks"). CUMIS argues the Bond deserves the "fidelity bond" label and so precludes coverage since the "dishonests acts" alleged by 625 3rd Street were not of the sort ordinarily covered by a fidelity bond. The "fidelity bond" label would also trigger presumptions favoring CUMIS. Alliant disagrees, arguing the Bond by its terms covers more than the kinds of losses fidelity bonds ordinarily cover and so cannot properly be dubbed a "fidelity bond." This otherwise question-begging analysis turns on a label. In the Bond title CUMIS drafted the policy is not called a "fidelity bond." It is labeled a "Credit Union Bond." Compl. Ex. B, at 9. Courts have

found polices are fidelity policies when the policy label "fidelity" is actually used. <u>RBC Mortg. Co.</u> <u>v. Nat'l Union Fire Ins. Co.</u>, 812 N.E.2d 728, 730-31 (Ill. App. Ct. 2004) (paying particular attention to the title of the policy). CUMIS could have easily called it a "fidelity bond," thereby expressing in policy terms what it now attempts to infer. That the Bond may insure losses a fidelity bond would cover does not necessarily restrict it to that coverage. By the clear language of the policy label the parties did not intend mere fidelity bond coverage.

The parties debate the language of the Bond as well. The Court must strive to read every provision as if it had a purpose, apply unambiguous language using words' ordinary meanings, and construe ambiguities against the drafter. <u>Valley Forge Ins.</u>, 860 N.E.2d at 314. The parties argue over the meanings of several words in the following provision:

> We will pay for your loss resulting directly from dishonest acts committed by an "employee" or "director,' acting alone or in collusion with others.
> Such dishonest acts must be committed by the "employee" or "director" with the intent to:
> > a. Cause you to sustain such loss; or
> > b. Obtain an improper benefit for the "employee," "director," or for any other person or entity.

Alliant contends this provision contains three elements which 625 3rd Street's allegations satisfy, namely (1) dishonest acts (2) committed by an employee or director (3) with requisite intent.

The Bond fails to define "dishonest act." When a policy fails to define an important term the Court consults its ordinary dictionary definition. <u>Supreme Laundry Serv. v. Hartford Cas. Ins. Co.</u>, 521 F.3d 743, 747 (7th Cir. 2008). Merriam-Webster.com defines "dishonest" as "characterized by lack of truth, honesty, or trustworthiness." Dictionary.com offers "(1) not honest; disposed to lie, cheat, or steal; not worthy of trust or belief . . . (2) proceeding from or exhibiting lack of honesty; fraudulent." The Oxford English Dictionary online suggests "entailing dishonour or disgrace;

16

dishonourable; discreditable; misbecoming; shameful; ignomious." 625 3rd Street alleges first Kaiperm and then Alliant maliciously lied, defrauded, and cheated 625 3rd Street, allegations falling within all or part of each of the three dictionary entries. The allegations are "actually within" this policy term.

The Bond defines "employee" as "persons who were, are, or may be in the future, acting under your immediate direction and control in the conduct of your business and while in the course or scope of performance of their assigned duties." Alliant argues that although 625 3rd Street's fraud allegations failed to name any Alliant agents, the allegations fall within this policy term because Alliant as a business entity could only act through its agents (i.e., its "employees"). Alliant also argues the allegations satisfy the term because CUMIS knew independently that two Alliant employees played roles in the alleged activities. CUMIS in fact concedes "each of the dishonest acts attributed to Alliant in the Underlying Litigation necessarily involved dishonest acts committed by Alliant's employees." CUMIS's Mem. of Law in Supp. of Its Cross-Mot. for Summ. J. 19. The Court finds this allegation satisfies the policy term since it is well settled that an "incorporeal" entity only acts through agents. Reich v. Sea Sprite Boat Co., 50 F.3d 413, 417 (7th Cir.1995).

Finally, the Bond's requisite "intent" includes the employee's aim to "obtain an improper benefit for the 'employee,' 'director,' or for any other person or entity." CUMIS argues that the alleged fraud Alliant carried out was intended to benefit Alliant, and therefore "does not constitute an 'other entity' as required by the Bond because Alliant succeeded to Kaiperm's liability, i.e., Kaiperm became Alliant." CUMIS's Opp'n to Alliant's Cross-Mot. for Summ. J. 5. Alliant, however, argues "other" does not clearly modify "entity," which could include Alliant, and is therefore ambiguous. The Court notes that "any" may modify "entity" as well, potentially bringing

Alliant within the term. This language is ambiguous and therefore construed against the drafter, CUMIS. See Valley Forge Ins. Co., 860 N.E.at 314. The Court finds the allegations fall "actually within" this policy term.[3]

CUMIS further contends that the phrase "loss resulting directly from dishonest acts" short-circuits Alliant's interpretation of indemnity coverage under the Bond because Alliant's loss was "indirect." The policy, CUMIS argues, covers only a "direct loss" such as an "actual depletion" of the insured's bank account by, for example, embezzlement. For support CUMIS cites RBC Mortgage where the court, interpreting a fidelity policy, rejected a proximate cause standard for the policy language, "loss resulting directly from." The court said that if an employee's dishonest act triggers litigation with a third party to whom the employee's principal becomes liable, the principal's loss from that liability is "indirect," and so not covered. RBC Mortg. Co., 812 N.E.2d at 733.

This interpretation may be appropriate where the parties intend, as in RBC Mortgage, ordinary fidelity insurance. That intent is not evident here, as previously discussed, and the stunted causation standard CUMIS proposes is wrong. A modest causal horizon is appropriate in a non-fidelity policy case so long as there is "actual depletion." See Rothschild Inv. Corp. v. Travelers Cas. & Sur. Co. of Am., No. 05 C 3041, 2006 WL 1236148, at *9-10 (N.D. Ill. 2006). Alliant's alleged acts, necessarily through its agents, were not direct theft yet directly caused Alliant to incur the cost of litigation and settlement. An "actual depletion" means the loss is real and pecuniary, not a

_____

[3] For clarity, the Court points out that although in a duty-to-indemnify analysis the allegations must fall "actually within" the policy terms, the Court first constructs the policy by applying the traditional rules of construction, including construing ambiguity against the drafter. The "actually within" standard applies to the allegations themselves. Any other approach would leave the analysis without a clearly defined policy within which the allegations could "actually" fall.

bookkeeping or theoretical loss. Id. at *9. Here Alliant says it paid at least $1 million to defend and

settle the claims, an actual depletion. This allegation is "actually within" the policy.

Because the allegations fall actually within Bond terms that unambiguously favor indemnity

coverage, or where ambiguous are construed to, and because CUMIS points to no policy exclusions,

the Court finds that CUMIS has a duty to indemnify Alliant for its defense costs and settlement in

the underlying litigation with 625 3rd Street. The clear terms of the Bond rule out a duty to defend,

however, and therefore CUMIS had no duty to defend Alliant in the lawsuit under the Bond.[4]

### 2. The DVE Policy

Unlike with the Bond language, the parties concede the DVE policy language creates a

potential duty to defend. The DVE states:

> CUMIS has no duty to defend any "claim" against the "insureds," or to pay any
> "defense costs" prior to the final adjudication or disposition of any "claim."
> However, if it is reasonably likely that coverage will be afforded under this Policy for
> any "claim," then subject to any applicable deductible, CUMIS will either
> > a. Conduct the investigation, defense and settlement of the "claim," in which
> > event CUMIS will choose attorneys to investigate and defend the "claim" and
> > will pay "defense costs" as incurred; or
> > b. Advance "defense costs" as they are incurred by the "insureds," and prior
> > to the final adjudication or disposition of the "claim" . . . .

While the policy denies a duty to defend, it carves an exception for "reasonably likely"

coverage and imposes a duty on CUMIS to defend or front defense costs for a covered claim.

The Court must strive to construe every policy provision as if it has a purpose. Valley Forge

---

[4] Courts have declared that where there is no duty to defend there can be no duty to indemnify. See, e.g., Crum & Forster Managers Corp., 620 N.E.2d at 1081. This overstated rule assumes that courts always first conduct a duty-to-defend analysis, which applies a "potentially within" standard for allegations vis-a-vis policy terms. Absent the potential inclusion there can be no actual inclusion (the indemnity standard is the latter). But where, as here, the parties contract not for a right to a defense but simply for indemnity then indemnity alone may create a duty. See Keystone Consol. Indus., Inc. v. Emp'rs Ins. Co. of Wausau, 456 F.3d 758, 761-62 & n.2 (7th. Cir. 2006).

Ins. Co., 860 N.E.2d at 314. The "reasonably likely" language is consistent with the "potentially within" standard for a duty to defend. The Court reads the DVE to foreclose a duty to defend unless the allegations fall "potentially within" policy terms, in which case a duty to defend arises. See Amerisure Mut. Ins. Co., 622 F.3d at 810; Crum & Forster Managers Corp., 620 N.E.2d at 1079.

CUMIS argues it properly refused coverage under the basic DVE policy because of exclusions within the policy as applied to Alliant itself, namely (1) insolvency of financial institutions, (2) breach of contract, and (3) conflict of interest or bad faith. But CUMIS argues that 625 3rd Street's allegations against Abrams and fifteen unnamed Does fail to trigger even the possibility of coverage since neither Abrams nor the Does are "insureds" as defined by the DVE. Alliant, however, contends CUMIS owed a duty to defend not only Alliant itself but also its employees, which included Abrams and the Does. The Court must construct relevant DVE policy provisions and assess whether the underlying allegations trigger DVE coverage.

The DVE's Entity Endorsement–a partially standalone policy provision–excludes coverage in relevant part for a "'loss' in connection with or arising out of any 'claim'" which is "based upon or resulting directly or indirectly from": (1) "any breach of contract"; (2) "conflicts of interest or acting in bad faith on the part of any 'insured' or any person for whose actions an 'insured' is legally responsible"; or (3) "the insolvency . . . or liquidation of any bank or banking organization . . . ." CUMIS has the burden of proving an exclusion applies. Hurst-Rosche Eng'rs, 51 F.3d at 1342. CUMIS eludes the duty to defend only if allegations on the face of the complaint are "clearly outside the bounds of the policy

coverage." McFatridge, 604 F.3d at 338. Still, the underlying claim must contain "*explicit*
factual allegations that potentially fall within policy coverage." Amerisure Mut. Ins. Co.,
622 F.3d at 810 (emphasis added). While the Court construes the allegations liberally in
favor of Alliant, Gen. Agents Ins. Co. of Am., 828 N.E.2d at 1098, it does not "speculate
about possible factual allegations that are absent from the claim itself," Amerisure Mut. Ins.
Co., 622 F.3d at 814.

Under CUMIS's view, the exclusions broadly cover 625 3rd Street's allegations
against Alliant. But the exclusions do not swallow the possibility of coverage.[5] The DVE
insures "wrongful acts" Alliant and its agents allegedly attempt or commit unless those acts
involve breach of contract, a conflict, bad faith, or insolvency. 625 3rd Street's allegations
expressly accuse Alliant of coercing a third party to dump a lease contract, purposely steering
a federally chartered credit union into insolvency, and chronically lying to and extorting 625
3rd Street to pull it off. Alliant contends that the volume and variety of claims makes it
implausible for the exclusions to rule out all coverage under this policy in way that is "clear
and free from doubt." Fireman's Fund Ins. Co. v. Amstek Metal, LLC, No. 07 C 647, 2008
WL 4066096, at *6 (N.D. Ill. Aug. 27, 2008). The Court, however, looks chiefly to the facts
alleged, not theories of liability. See Knoll Pharma. Co. v. Auto. Ins. Co. of Hartford, 152
F. Supp. 2d 1026, 1034 (N.D. Ill. 2001) (noting the "determinative factor is not the legal
label" but "whether the alleged conduct arguably falls within" the policy).

---

[5] Alliant argues the conflict of interest and bad faith exclusions eviscerate coverage if applied as CUMIS
urges. This is plainly wrong with respect to conflicts of interest. Alliant's argument has traction, however, with
respect to bad faith as it may be quite hard to accomplish many dishonest acts in good faith. But since the
allegations fall under other exclusions the Court need not reach the issue of the breadth of the bad faith exclusion.

The same alleged facts regarding breach, insolvency, and fraud underlie all of 625 3rd Street's claims, clearly triggering each of the three Entity Endorsement exclusions. Ordinarily, policy exclusions are strictly construed against the drafter because "the policy's overall purpose is to provide coverage to the insured." Outboard Marine Corp., 607 N.E.2d at 1217. Yet the "primary purpose in construing the instant policy provision is to ascertain the intent of the parties." Id. at 1215. The language of the contract here best expresses the intent of the parties, and courts should strive to interpret contracts so that every provision serves a purpose. See Valley Forge Ins. Co., 860 N.E.2d at 314. Alliant has insured against specific risks with a DVE, and risks narrower yet with an endorsement carrying its own exclusions. Alliant allegedly engaged in conduct falling directly within the exclusions. CUMIS has therefore carried its burden of showing exclusions apply in a manner "clear and free from doubt." CUMIS has no duty to defend under the Entity Endorsement.

Alliant maintains CUMIS still owed a duty to defend under the standard DVE policy for its agents. CUMIS argues that because 625 3rd Street's complaint does not clearly name an Alliant employee, director, or volunteer, there is no "insured" to whom any duty is owed. The question turns on whether the fifteen unnamed Does and Abrams–all of whom the underlying complaint does name–qualify as "employees" of Alliant. 625 3rd Street describes the Does as "individuals, corporations, partnerships, joint ventures, and/or associations" unknown in name and capacity; as "individuals and/or entities" unknown in name and connection to and responsibility for damages; and as "alter-egos" unknown in name and capacity. Compl. Ex. A., at 2. Based on the facts alleged, the Does are not necessarily Alliant employees. Similarly, Abrams, at one time Kaiperm's CEO, could have been an

Alliant employee, but it is not explicitly alleged. Indeed, Alliant discusses these allegations in phrases such as "strongly suggests" and "might have." Alliant's Mem. of Law in Resp. to CUMIS's Cross-Mot. for Summ. J. 10. This is unlike the Bond's coverage for dishonest acts where it requires no speculation to understand Alliant acts only through its agents, whoever they are. Here the alleged misconduct is by unknown individuals and an individual not alleged to be an Alliant agent. They may be the same individuals implicated by the Bond coverage. Or they may not. But this is speculation. A "theoretical possibility" without more is not enough, since "it is the actual complaint, not some hypothetical version, that must be considered." Amerisure Mut. Ins. Co., 622 F.3d at 812 (internal citation omitted). Facts not explicitly alleged cannot come potentially within coverage. See id. at 814.

Because CUMIS demonstrated that the underlying allegations fall within the Entity Endorsement exclusions in a way that is free and clear from doubt, and because the alleged facts regarding Abrams and the fifteen Does do not explicitly implicate them as Alliant employees, CUMIS has no duty to defend under the DVE policy.

### 3. SEL Policy[6]

The SEL policy provides that "CUMIS will pay on behalf of the 'credit union,' 'loss' the 'credit union' is legally obligated to pay as a result of any 'claim' that is first made against the 'credit union' for unintentional violations of any unfair or deceptive trade practices act, statute, regulation, or other law."

---

[6] The SEL's duty-to-defend language is identical to that in the DVE and is not disputed by the parties. The Court accordingly finds that it gives rise to a potential duty to defend.

The word "unintentional" is key. Nothing about the allegations in 625 3rd Street's complaint suggest anything Alliant and its agents did was unintentional. The underlying allegations paint a picture of concerted, deliberate, protracted fraud–intentional conduct. While not determinative, all ten theories of liability in the complaint incorporate intentional acts, which is consistent with facts clearly outside the bounds of coverage. See McFatridge, 604 F.3d at 338. Alliant itself notes that the allegations "*could be* construed as unintentional." Mem. of Law in Supp. of Alliant's Mot. for Partial Summ. J. 19 (emphasis added). Unintentional acts are not explicitly alleged here, and a court "is not permitted simply to speculate about possible factual allegations that are absent from the claim itself." Amerisure Mut. Ins. Co., 622 F.3d at 814. Alliant's argument suggesting that successor liability could render Alliant "unintentionally" liable for intentional acts of Kaiperm and Abrams is unavailing since Alliant would succeed to liability for *intentional* acts.

Even if the law might allow 625 3rd Street to recover under a theory of liability for unintentional conduct, it would be irrelevant since the complaint alleges only intentional acts. See Conn. Indem. Co. v. DER Travel Serv., Inc., 328 F.3d 347, 350-51 (7th Cir. 2007). 625 3rd Street's extensive allegations of fraud, concealment, misrepresentation, extortion, and coercion are "the paradigm of intentional conduct and the antithesis of negligent actions." Id. at 351. The Court would have to engage in muscular speculation to conjure factual scenarios here that are "unintentional." Because the underlying facts that are explicitly alleged do not fall potentially within the SEL, CUMIS owed no duty to defend under that policy.

24

### III. CONCLUSION

For the foregoing reasons, each the of parties' motions for summary judgment are granted in part and denied in part. Alliant's motion is granted in part because CUMIS owes Alliant a duty to indemnify under the Bond policy for defense costs and settlement, but the rest of the motion is denied. CUMIS's motion is granted in part because CUMIS had no duty to defend under any of the policies, but the motion is otherwise denied.

IT IS SO ORDERED.

ENTER:

CHARLES RONALD NORGLE, Judge

United States District Court

DATED: 3/10/11